IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

ROSS E. PIES,

                        Plaintiff,                                    09-CV-754-ST

            v.                                                FINDINGS AND
                                                              RECOMMENDATION

DR. STEVEN CHU,
Secretary, United States Department of Energy,

                        Defendant.

STEWART, Magistrate Judge:                          **<u>INTRODUCTION</u>**

        Plaintiff, Ross E. Pies ("Pies"), appearing *pro se*, filed this action on July 1, 2009,

alleging that his employer, the Bonneville Power Administration ("BPA"), unlawfully retaliated

against him in violation of Title VII, 42 USC § 2000e-3.  The BPA is a federal agency

headquartered in Portland, Oregon, under the purview of the United States Department of

Energy.  Defendant has filed a Motion for Summary Judgment (docket # 18).  For the reasons

that follow, the motion should be GRANTED.

1 - FINDINGS AND RECOMMENDATION

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Farrakhan v. Gregoire*, 590 F3d 989, 1014 (9th Cir 2010), citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986). In employment discrimination cases "very little evidence" is required to survive summary judgment "because the ultimate question is one that can only be resolved through a searching inquiry – one that is most appropriately conducted by the factfinder, upon a full record. " *Schnidrig v. Columbia Mach., Inc.*, 80 F3d 1406, 1410 (9th Cir) (internal quotations, citation omitted), *cert denied*, 519 US 927 (1996).

## FACTS

The BPA markets and transmits electrical power throughout the Pacific Northwest.  Pies initially worked for the BPA from 1992 to 1997 and returned in 2000.  Danielson Decl., Ex. 1 ("Pies Depo."), pp. 10-12.   In October 2005, Pies was a computer specialist and project manager within the Power Business Line Division in Portland, Oregon.  *Id*, pp. 16-18.  He is currently assigned to the Continuity of Operations in the Transmission Business Line Division in Vancouver, Washington.  Rush Decl., pp. 40-41 (Furumasu Aff., pp. 15-16), 88.[1]

In October 2005, Mark Pierce ("Pierce"), Pies's former supervisor, filed a racial discrimination and retaliation complaint against the BPA.  Pies Depo., p. 18.  At the time, Lee Hall ("Hall") and Brian Furumasu ("Furumasu") supervised Pierce.  Rush Decl., p. 3 (Pies Aff., p. 3).  Pies testified in support of Pierce's complaint in the Equal Employment Opportunity ("EEO") office at the BPA in late October and submitted an affidavit on his behalf, dated October 31, 2005.  Pies Depo., pp. 82-84; Rush Decl., pp. 3 (Pies Aff., pp. 3), 84, 93-97.

Pies asserts that he was removed from the Public Key Infrastructure ("PKI"), Cisco Security Agent ("CSA"), and Opsware projects in November 2005, one month after testifying in support of Pierce's complaint.  Rush Decl., pp. 8-10, 12 (Pies Aff., pp. 8-10, 12), p. 33 (Furumasu Aff., p. 8).  Pies then asked to be transferred, but his requests were ignored.  *Id*, p. 10, 14 (Pies Aff., p. 14).  He did not learn why he had been removed from the projects until March 7, 2006.  *Id*, p. 10 (Pies Aff., p. 10); Complaint, Ex. B, p. 1.

---

[1] The BPA has submitted some of the affidavits, depositions, and exhibits from the EEO Report of Investigation ("ROI") conducted in Pies's case as attachments to the Rush Declaration.  For ease of reference, the court includes not only the page number of the Rush Declaration, but also identifies the page number of the particular affidavit in the ROI.

On March 7, 2006, Gary Sanford ("Sanford"), Pies's supervisor, gave Pies a written performance appraisal which noted that while his performance was satisfactory in some respects, he had problems in two key areas, "Managing Work Assignments" and "Teamwork." Pies Depo., pp. 47-48; Danielson Decl., Ex. 1, pp. 12-13.

With regard to managing work assignments, Sanford identified three problem areas. *Id*. First, Pies was having difficulty regularly listening to customers and clients to understand their needs and interacting with them in a positive manner, as evidenced by the fact that Mark Willner ("Willner"), the management sponsor, of the PKE, CSA, and Opsware projects, specifically requested that Pies be removed from the projects because of difficulty working with him. Rush Decl., p. 7 (Pies Aff., p. 7). Second, Sanford had received complaints that Pies had exceeded his project manager role, which was evidence that Pies had deficiencies in his ability to ensure commitments to clients are met and consider consequences to clients before taking action. Danielson Decl., Ex. 1, p. 12. Finally, Sanford was required to intervene on more than one occasion in order to keep Pies assigned to the projects, indicating that Pies needed more than minimum oversight. *Id*. As a result, Sanford removed Pies from his project manager role on the PKI, CSA, and Opsware projects. *Id*.

With regard to Pies's deficiencies in working on a team, Sanford indicated that he had recently received feedback from the project manager for the Agency Load Forecasting Project that Pies required continued support from other team members to ensure that tasks receive appropriate oversight. *Id*, p. 13. Sanford interpreted these complaints as evidence that Pies was not effectively communicating information needed for task completion and was having difficulty maintaining positive and productive relationships. *Id*.

4 - FINDINGS AND RECOMMENDATION

Pies was warned that unless he improved, his next performance rating would be "Unacceptable," a rating which could lead to formal performance improvement procedures. *Id*. Sanford also indicated that he was planning to relocate Pies's workstation to another area and expected Pies to work "core hours" in order to facilitate communication and provide for more informal feedback opportunities. *Id*.

After the March 7 meeting, Pies was distraught and took some time off work. Pies Depo., pp. 48-49. Throughout his lengthy career at the BPA, he had always received outstanding performance appraisals. Rush Decl., p. 5 (Pies Aff., p. 5). Pies characterizes the March 7 meeting as a "one sided attack on [his] credibility" which caused him to be so upset that he refused to sign the performance appraisal sheet. *Id*, p. 6 (Pies. Aff., p. 6). He phoned in sick the next several days due to the stress caused by the meeting. *Id*, pp. 15-16 (Pies Aff., pp. 15-16).

On March 13, 2006, Sanford sent Pies a memo, warning him that he could not grant himself emergency leave without prior approval. *Id*, p. 72. That same day, Pies contacted Terri Bull ("Bull"), an EEO counselor, because he believed he was being harassed about his use of leave. *Id*, p. 82.[2] He explained that he had been very upset since his March 7 performance appraisal and had been home sick. *Id*. Sanford had changed his sick leave for the previous day to leave without pay ("LWOP"). *Id*.

On March 17, 2006, Pies spoke with Shani Taha ("Taha"), Vice President for Employee and Business Resources, who noted that "[Pies] has been experiencing what may very well be considered organizational harassment." *Id*, pp. 84, 91. She referred Pies to Bull for assistance

---

[2] Bull's notes give two dates for this initial contact. Her "chronology of EEO counseling" notes that the date of initial contact was March 13 (Rush Decl., p. 82), but her expanded chronology notes that the date was March 16, 2006 (*id*, p. 84). Viewing the facts in the light most favorable to Pies, the court will use the earlier date for purposes of the current motion.

and authorized him to take sick leave, but also advised him to notify his office. *Id*; Pies Depo., pp. 49-50. On March 22, 2006, Sanford tentatively changed the absences back to sick leave, noting that Pies would need to submit medical documentation upon his return to work. Rush Decl., p. 92.

On March 20, 2006, Pies met with Bull and initiated informal EEO counseling, explaining that he needed to be reassigned to a different job because he was unable to sleep, was experiencing chest pains, and was under extreme stress. *Id*, p. 84. On March 22, Bull met with Vickie Van Zandt, ("Van Zandt"), Vice President for the Transmission Business Line, who agreed to meet with Pies and work out a solution. *Id*, p. 85.

On March 22, 2006, the Crisis Intervention Team ("CIT") had a meeting to address some concerns about Pies and whether to restrict his access to certain facilities or systems. *Id*, p. 98 (Arthurs Decl.), ¶¶ 2-4. A CIT is called to address serious concerns about an employee's behavior, with representatives from Employee Relations, Security, General Counsel, and a psychologist in attendance, as well as the immediate supervisor and any other individuals deemed necessary. *Id* (Arthurs Decl., ¶ 3). Sanford reported that Pies was disgruntled over decision-making in his unit, was visibly upset after his March 7 performance appraisal, was reported crying in a March 17 meeting, and called in sick numerous days because of stress. *Id* (Arthurs Decl., ¶¶ 5-6). The conclusion of the CIT "left reasonable uncertainty regarding Mr. Pies's future actions while performing his duties," but the CIT did not perceive him as posing a physical threat. *Id*, pp. 99 (Arthurs Decl., ¶ 7), 102. However, because of his knowledge of the agency's computer systems, his access to sensitive areas was removed, though his general access privileges were unaffected. *Id*.

On March 24, 2006, Van Zandt contacted Furumasu and Nelson King ("King") in order to discuss a "stop-gap" placement detail for Pies until a more permanent solution could be found. *Id*, p. 85.  At the time, Furumasu was a second level supervisor and reviewing official for Pies and was kept apprised of the performance issues Sanford was having with Pies.  *Id*, pp. 29-30 (Furumasu Decl., pp. 4-5).  King was the Special Projects Manager for the Transmission Business Line and indicated that he had a four-month project detail for Pies.  *Id*, p. 85; Pies Depo., pp. 36-37.  The same day, Furumasu left a voicemail message for Bull, indicating that he wanted to speak to Pies about his harassment allegations and would like medical documentation relating to Pies's stress-induced symptoms.  Rush Decl., p. 85.

Also on March 24 while he was off work, Pies tried to enter the Emergency Scheduling Center to check his email, was taken into a break room by security officers, and was told that Furumasu had revoked his access to the building.  Pies Depo., pp. 40-43; Rush Decl., pp. 17-18 (Pies Aff., pp. 17-18).  Pies was notified of the restriction on March 31, 2006.  Rush Decl., p. 18 (Pies Aff., p. 18).  By May 17, 2006, the restriction was rescinded.  *Id*, p. 103.

On March 27, 2006, Furumasu requested that Pies meet with Dr. Richard Joslin, a staff psychologist.  *Id*, p. 19 ( Pies Aff., p. 19), p. 40 (Furumasu Aff., p. 15).  Furumasu was aware that Pies was in a very emotional and distressed state after his appraisal with Sanford on March 7.  *Id*, pp. 39 (Furumasu Aff., pp. 14).  He did not report to his duty station and did not return Sanford's emails or calls, which ultimately resulted in Sanford calling the CIT meeting.  *Id*. Furumasu also had information that Pies displayed distress and broke down emotionally in meetings with Taha and Van Zandt.  *Id*, p. 40 (Furumasu Aff., p. 15).  Shortly after making this request, Furumasu was advised by Donald Rubard ("Rubard") in Human Resources that it was

not appropriate for him to make such a request because it could have been characterized as impermissibly requiring an employee to report for a medical examination in order to return to work. *Id*, p. 40 (Furumasu Aff., p. 15), pp. 58-61 (Rubard Aff., pp. 3-6). Rubard and Furumasu left messages with Dr. Joslin recommending that he not meet with Pies. *Id*.

Dr. Joslin was scheduled to meet with Pies on March 29, 2006. *Id*, p. 52 (Joslin Aff., p. 3). He believes that Pies both made and cancelled the appointment because he does not recall anyone else doing so. *Id*, pp. 52-53 (Joslin Aff., pp. 3-4). Dr. Joslin does not believe that anyone directed him not to meet with Pies and would have ignored such a request, as it would have been a violation of federal law. *Id*, p. 53 (Joslin Aff., p. 4). Pies claims that Bull made an appointment for him with Dr. Joslin upon Furumasu's request, but that when Bull called to tell him about the request, Pies informed her that he had already made his own appointment. Rush Decl., p. 19 (Pies Aff., p. 19). Upon arriving at Dr. Joslin's office, Pies was informed that Furumasu had canceled his meeting because he did not think it was appropriate. *Id.*

Immediately afterward, Pies met with Mark Danley, Rubard, and Furumasu and learned that he was being considered absent without leave ("AWOL"). *Id*, pp. 16-17, 19 (Pies. Aff., pp. 16-17, 19). At that time, Pies was assigned to an informal detail at the Transmission Business Line working with King. Pies Depo., pp. 36-37; Rush Decl., pp. 46-47 (King Aff., pp. 3-4). King had recently approved Pies's request for two half-days off from work in order to attend his son's soccer training sessions in Salem. Pies Depo., pp. 37-38. However, Pies was told that he would be charged with AWOL because King did not have the authority to approve the leave. *Id*, p. 38; Rush Decl., p. 19 (Pies Aff., p. 19). Once King learned of this, he took the

matter to the EEO and Personnel offices, the matter was resolved, and Pies was never officially charged with being AWOL.  Pies Depo., p. 39; Rush Decl., pp. 48-49 (King Aff., pp. 5-6).

On March 30, Pies formally requested to transfer to another job in the Transmission Business Line in Vancouver, Washington.  Rush Decl., p. 90.  He was ultimately given the job, with the reassignment becoming permanent on June 25, 2006.  *Id*, p. 88, 97.  Pies asserts that this job has less advancement potential and that his reputation at the BPA headquarters in Portland has been tarnished.  *Id*, pp. 20-21 (Pies Aff., pp. 20-21).

On July 10, 2006, Pies filed a formal EEO complaint, identifying six alleged adverse employment actions taken against him.  *Id*, pp. 73, 76; Pies Depo., p. 85.

## FINDINGS

### I.  Retaliation

Claims for retaliation under Title VII may be analyzed using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 US 792, 802 (1973).  *Stegall v. Citadel Broadcasting Co.*, 350 F3d 1061, 1065-66 (9th Cir 2003).  First, the plaintiff must satisfy his *prima facie* case by showing:  (1) he is a member of a protected class or engaged in protected activity; (2) he suffered an adverse employment action; and (3) a causal link exists between his status or activity and the employment action.  *See Trent v. Valley Elec. Ass'n Inc.*, 41 F3d 524, 526 (9th Cir 1994); *Steiner v. Showboat Operating Co.*, 25 F3d 1459, 1464 (9th Cir 1994).  The plaintiff's burden to establish a *prima facie* case "is minimal and does not even need to rise to the level of a preponderance of the evidence."  *Wallis v. J.R. Simplot Co.*, 26 F3d 885, 889 (9th Cir 1994) (citation omitted).

"In Title VII retaliation cases, once the plaintiff has established a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nonretaliatory explanation for its decisions." *Yartzoff v. Thomas*, 809 F2d 1371, 1376 (9th Cir 1987) (citation omitted), *cert denied*, 498 US 939 (1990). Where an employer does so, "the legally mandatory inference of retaliatory discrimination arising from the plaintiff's prima facie case drops away." *Id* at 1377 (citation omitted). The burden of production again falls on the plaintiff to show that the explanation is a pretext for impermissible retaliation. *Id*. This burden "merges with the plaintiff's ultimate burden of persuading the court that he is the victim of retaliation." *Id*.

### A. *Prima Facie* Case

#### 1. Protected Activity

In late October 2005, Pies submitted an affidavit and testified in support of another BPA employee's discrimination and retaliation complaint. Several months later, Pies contacted an EEO counselor, complaining of harassment for his use of leave. He began his own EEO counseling on March 20, 2006, ultimately filing a formal complaint on July 10, 2006. Accordingly, Pies engaged in protected activity.

#### 2. Adverse Employment Actions

In his EEO complaint, Pies identified the following six adverse employment actions taken against him as a consequence of testifying in Pierce's EEO case: (1) a negative performance appraisal on March 7, 2006; (2) a threat of LWOP; (3) a threat of AWOL; (4) revocation of his security clearance; (5) denial of access to a counseling session with a staff psychologist; and (6) reassignment upon request to a position with has less advancement potential in order to avoid a hostile work environment. Rush Decl., p. 73.

An adverse employment action is an "employer action[] that would have been materially adverse to a reasonable employee . . . . [T]hat means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 US 53, 57 (2006). Under that standard, a negative performance appraisal, threats of being declared LWOP or AWOL, and revocation of a security clearance without notice, resulting in public humiliation, could well dissuade a reasonable employee from reporting retaliatory conduct and constitute adverse employment actions. In contrast, denial of access to a psychologist and honoring a reassignment request would not constitute adverse employment actions sufficient to support a retaliation claim. However, for purposes of this motion, this court will address all six alleged adverse employment actions.

### 3. Causation

"To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Cohen v. Fred Meyer, Inc.*, 686 F2d 793, 796 (9th Cir 1982) (citations omitted). "[A] *prima facie* case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory [activity]." *Yartzoff*, 809 F2d at 1376. The showing required to meet this burden is minimal, but it is "[e]ssential to a causal link . . . that the employer was aware that the plaintiff had engaged in the protected activity." *Cohen*, 686 F2d at 796.

The BPA asserts that Pies cannot establish the requisite causal link because four of the allegedly adverse employment actions took place prior to Pies's supervisors becoming aware that

he engaged in protected activity.  Pies asserts that the management officials involved in retaliating against him for testifying in Pierce's EEO case are Furumasu, Sanford, Hall, and Willner.  Rush Decl., p. 4 (Pies Aff., p 4).  The BPA responds that the first time any of these individuals knew that Pies had initiated an EEO complaint regarding harassment in the workplace was on March 24, 2006, when Van Zandt spoke with Furumasu about finding a temporary work assignment for Pies until a more permanent solution could be found.  *Id*, p. 85.[3]

The BPA is correct that four of the alleged adverse employment actions happened before that date, namely: (1) the March 7, 2006 negative performance appraisal; (2) the March 17, 2006 LWOP incident; (3) the March 20, 2006 discussion of job reassignment with his EEO counselor; and (4) the March 22, 2006 restriction of Pies's security clearance.  Even though Pies did not officially notify his supervisors that he was requesting reassignment until March 30, 2006, the process of finding him another assignment began as early as March 24, when Van Zandt spoke with Furumasu for that very purpose.  *Id*, pp. 84-85, 90.

However, Pies asserts that his managers knew of his involvement in Pierce's EEO complaint based primarily upon the proximity of his testimony in Pierce's EEO case in late October 2005 to the actions taken by defendants.  The Ninth Circuit has held that "when adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred."  *Passantino v. Johnson & Johnson Consumer Prods., Inc*, 212 F3d 493, 507 (9th Cir 2000) (citing cases).  Pies's strongest evidence to support his position is his removal from three projects within a month after testifying

---

[3] To the contrary, Furumasu testified that he did not become aware that Pies had testified in an earlier EEO complaint until sometime in August 2007 when he reviewed Pies's EEO complaint.  Rush Decl., p. 42 (Furumasu Aff., p. 17).

for Pierce without any reason being given until the March 7, 2006 performance meeting.[4]  Rush

Decl., pp. 8-10, 12 (Pies Aff., pp. 8-10, 12); Complaint, Ex. B, p. 1.  Adding further credence is

his allegation that his performance appraisal meeting was pushed back several times without

explanation.  *Id*, p. 5; Pies Depo., pp. 47-48.  Based on his performance appraisal on January 11,

2005, his next annual appraisal was due in January 2006, but did not occur until March 7, 2006,

which the BPA characterized as his mid-year review.  Rush Decl., p. 5 (Pies Aff., p. 5).  The

record contains no explanation why, after removing Pies from three projects, the BPA failed to

timely conduct his annual appraisal.  It seems strange that if Pies had severe performance

problems that the BPA would push back his review several months.

     The time between the negative March 7, 2006 performance appraisal documenting Pies's

earlier removal from three projects and the nearest protected activity of Pies testifying in Pierce's

EEO hearing is approximately four months.  Thus, giving Pies the benefit of every doubt and

keeping in mind that his burden in establishing a *prima facie* case is minimal, it is reasonable to

infer that at least one of his managers was aware of his testimony in Pierce's EEO case and that

such knowledge motivated the alleged retaliatory conduct.  *See Villiarimo*, 281 F3d at 1065

("[C]ausation can be inferred from timing alone where an adverse employment action follows on

the heels of protected activity."); *see also Coszalter v. City of Salem*, 320 F3d 968, 977 (9th Cir

2003) ("Depending on the circumstances, three to eight months is easily within a time range that

can support an inference of retaliation.").

---

[4] Pies also asserts that his managers could have checked his calendar on the BPA network to learn when he testified at Pierce's EEO hearing and thus could have known that he was participating in the EEO hearing.  Pies Depo., p. 82.  However, he also admits that even if his supervisors looked at his calendar for that day, all that would have been visible would have been the symbol of a key and the words "private appointment." *Id*, pp. 82-84; Complaint, Ex. A, pp. 3-5.  This allegation is mere speculation on Pies's part and cannot serve as a sufficient causal link to establish that his supervisors had knowledge of his involvement in the earlier EEO complaint.

Thus, viewing the facts in the light most favorable to Pies, and giving him every reasonable inference, he has created an issue of fact as to whether his removal from the projects, subsequent negative performance appraisal, and other alleged adverse employment actions were due to his protected conduct.

### B. **BPA's Justification**

Since Pies has established a *prima facie* case, the BPA must articulate a legitimate non-retaliatory reason for the adverse employment actions. *Cohen*, 686 F2d at 796. It "need not prove the absence of retaliatory intent or motive; it simply must produce evidence sufficient to dispel the inference of retaliation raised by the plaintiff." *Id* (citations omitted). This is merely a burden of production as the ultimate burden of persuasion remains with Pies at all times. *Id* at 796-97.

With respect to the negative performance appraisal on March 7, 2006, the BPA asserts that it was justified because Pies was having trouble managing his work assignments and working in a team. Pies Depo., pp. 47-48; Danielson Decl., Ex. 1, pp. 12-13. Sanford had received complaints that Pies was difficult to work with, had exceeded his project manager role on several projects, had difficulty considering the consequences to clients before taking action, and was not able to provide appropriate task oversight because of his failure to communicate with his team members. Danielson Decl., Ex. 1, pp. 12-13. Sanford also was required to intervene on more than one occasion in order to keep Pies assigned to the projects, but ultimately had to remove Pies from the PKI, CSA, and Opsware projects. *Id*.

In response to Pies's allegation that he was threatened with LWOP by Sanford, the BPA justifies its action because, on at least two occasions, Pies left work early without applying for

leave or notifying his supervisor directly, in violation of appropriate leave procedures.  Rush

Decl., pp. 64 (Rubard Aff., p. 9), 72.  In the days after his negative performance appraisal, Pies

was not reporting to his duty station and was not responsive to his supervisor's emails and phone

calls inquiring about his attendance status.  As a result, Sanford told him to provide medical

documentation to support his claim for sick leave.  *Id*, pp. 38 (Furumasu Aff., p. 13), 64 (Rubard

Aff., p. 9).  Pies was never given LWOP at any time during March 2006.  *Id*, pp. 67 (Rubard Aff,

pp. 12), 82.

According to the BPA, the AWOL threat was a result of miscommunication regarding

who retained supervisory control over Pies during his informal detail with the Transmission

Business Line.  *Id*, pp. 17 (Pies Aff., p. 17), 47 (King Aff., p. 4).  Pies's immediate supervisor

with the Transmission Business Line was King who signed two leave slips for Pies, believing

that he had the authority to do so.  *Id*, pp. 47-48 (King Aff., pp. 4-5).  Upon realizing that Pies

had been threatened with being declared AWOL for the leave he had approved, King contacted

the EEO and Personnel offices in order to resolve the issue.  *Id*, pp. 48-49 (King Aff., pp. 5-6).

Ultimately, the issue was resolved without Pies being declared AWOL.  *Id*, p. 17 (Pies Aff.,

p. 17), p. 67 (Rubard Aff, p. 12).

The primary reason offered by the BPA for modifying Pies's security clearance and

restricting his access is that the CIT group, as part of its risk assessment, concluded that Pies had

some sensitive computer permissions, was currently out on leave, was avoiding contact with his

supervisor, and was highly emotional.  *Id*, pp. 64, 67 (Rubard Aff., pp. 9, 12), pp. 98-99 (Arthurs

Decl., ¶¶ 5-7).

Regarding Pies's allegation that he was denied access to a counseling session with a staff psychologist, the BPA explains that the meeting was cancelled because Dr. Joslin's primary role is to advise management.  Thus, it would be inappropriate for Pies to meet with him in a traditional counseling role with an expectation of impartiality and confidentiality.  *Id*, pp. 58-59, 62 (Rubard Aff., pp. 3-4, 7).  Rubard explains that Furumasu had mistakenly requested that Pies meet with Dr. Joslin after Rubard had told him that when an employee requests reassignment based upon medical reasons, it is generally unwise for management to make the assignment without medical documentation that the new assignment is appropriate.  *Id*, pp. 58-59 (Rubard Aff., pp. 3-4).  Rather than waiting for Pies's medical documentation, Furumasu encouraged Pies to obtain an evaluation from Dr. Joslin regarding his readiness for the new assignment.  *Id*. Furumasu cancelled the appointment after learning that, given Dr. Joslin's role, it was inappropriate for him to evaluate Pies's ability to perform a particular kind of work.  *Id*, pp. 59, 62 (Rubard Aff., pp. 4, 7).  The same day that Pies was scheduled to meet with Dr. Joslin, Rubard explained to Pies that, given his concerns about his managers, it would be more appropriate for him to meet with the BPA's contract employee assistance service that affords employees maximum impartiality and confidentiality rather than Dr. Joslin who primarily serves as an advisor to management.  *Id*, p. 62 (Rubard Aff., p. 7).

Finally, the BPA points out that it reassigned Pies to the position he specifically requested.  *Id*, p. 41 (Furumasu Decl., p. 16).  At the time, Pies made reassignment the urgent priority, did not mention advancement potential as a consideration, and made a specific request to be reassigned to work on the Continuity of Operations in the Transmission Business Line.  *Id*, pp. 40-41 (Furumasu Decl., pp. 15-16).  That request was honored.  He was originally reassigned

for a four month detail, with the reassignment becoming permanent on June 25, 2006. *Id*, pp. 47 (King Aff., p. 4), 88. The position in the Transmission Business Line is the same grade as the position he previously held while working in the Power Business Line. *Id*, p. 41 (Furumasu Decl., p. 16).

These are all legitimate, non-retaliatory, justifications for the actions taken by the BPA.

**C. Pretext**

Because the BPA has produced legitimate justifications for the adverse employment actions, "the legally mandatory inference of retaliatory discrimination arising from the plaintiff's *prima facie* case drops away." *Yartzoff*, 809 F2d at 1377. The burden of production falls on Pies to show that the BPA's explanation is a pretext for impermissible retaliation. *Id*. "This burden merges with [Pies'] ultimate burden of persuading the court that [he] is the victim of retaliation." *Id*. He "can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F3d 1115, 1127 (9th Cir 2000) (citation omitted). In considering these, "[e]vidence already introduced to establish the *prima facie* case may be considered . . . ." *Yartzoff*, 809 F2d at 1377. "When that evidence, direct or circumstantial *consists of more* than the [*prima facie*] presumption, a factual question will almost always exist with respect to any claim of nondiscriminatory reason[,]" but "in those cases where the *prima facie* case consists of no more than the minimum necessary to create a presumption of discrimination . . . , plaintiff has failed to raise a triable issue of fact." *Wallis*, 26 F3d at 890 (internal quotations, citation omitted) (emphasis and brackets in original). Pies must do more

than simply "establish a *prima facie* case and deny the credibility of [the BPA's] witnesses." *Id* (citation omitted).

The primary factual dispute concerns when, if ever, Pies's supervisors knew that he had testified in support of Pierce's EEO complaint. This knowledge is critical to Pies's claim because if any of his supervisors were aware of his protected activity prior to March 24, 2006, when Furumasu was informed that Pies had initiated his own EEO action, then many of their alleged actions could be considered retaliatory.

The BPA has presented evidence from Rush that while involved management officials will receive a written description of a formal EEO complaint, they neither receive a copy of the complaint nor have access to the ROI. Rush Decl., pp. 100-01 (Rush Decl., ¶¶ 4, 6). Moreover, they are only entitled to review a copy of their own sworn statements from the ROI, but no other documents may be released. *Id*, p. 101 (Rush Decl., ¶ 6). While Furumasu was a witness in Pierce's earlier EEO investigation, he was not permitted access to the ROI, witness list, or other witness' statements. *Id*, p. 101 (Rush Decl., ¶ 11).

Pies has submitted an email from Pierce, attesting to his personal belief that Furumasu was indeed made aware of the contents of his EEO investigative report sometime between November 2005 and February 2006. Complaint, Ex. A, pp. 5-6. Pierce acknowledges that it is "impossible . . . to unequivocally state" that Furumasu read the complete report and saw Pies's testimony, but thinks that the circumstances "strongly suggest" that he had access to the complete investigative report because he was "permitted to provide rebuttal statements to specific statements contained in individual affidavits prepared for inclusion in the investigative report." *Id*. Even if Furumasu responded to specific statements in certain affidavits, Pierce has

no knowledge whether Furumasu actually read the report, as opposed to simply being asked by

the EEO investigator to respond to specific statements without being given the complete report

to read.  Notably, Pierce does not state that Furumasu provided to rebuttal statements to any

affidavit by Pies.  Pierce's email is not based on his personal knowledge as to relevant facts, but

is purely speculative and, thus, constitutes insufficient evidence to support Pies's claim.

Pies also submits a copy of his email correspondence with Rush in September 2007

asking who has access to view Pierce's EEO case file.  *Id*, pp. 7-8.  Rush responded that the

involved management officials would have access to the file, but that:

> [They] only have access to their own sworn statements in the ROI.  They
> do not receive a copy of the ROI nor do they have access to any other
> information or statements contained in the ROI other than what they have
> provided with their own statements.

*Id*, p. 8.

Contrary to Pies's assertion, Rush's response to his inquiry is consistent with her

declaration submitted by the BPA.

The only other factual dispute submitted by Pies is whether Willner told management that

he did not want to work with Pies on the PKI, CSA, or Opsware projects, which was part of the

basis for the negative performance appraisal and Pies's removal from those projects.  Danielson

Decl., Ex. 1, pp. 12-13 (performance appraisal document); Rush Decl., p. 32 (Furumasu Aff.,

p. 7), pp. 7-9 (Pies Aff., pp. 7-9) (noting that Willner did not say that he did not want to work

with Pies, but was having difficulty with him on another project).  However, this dispute is not

material, given ample support for the other performance deficiencies appearing in the

performance appraisal document.  *See id*, pp. 31, 34-37 (Furumasu Aff., pp. 6, 9-12), pp. 68-69

(Rubard Aff., pp. 13-14).

Accordingly, Pies's allegations are insufficient to raise a genuine issue of fact as to whether the asserted justifications are pretext for retaliating against Pies for engaging in protected activity.   Accordingly, the BPA should be granted summary judgment on Pies's retaliation claim.

## II.  Hostile Work Environment

Although Pies primarily alleges a claim for retaliation, it also appears that he asserts that the BPA created a hostile work environment for him by engaging in the allegedly retaliatory actions discussed above.  *See* Complaint, p. 12.

To establish a *prima facie* hostile work environment claim under Title VII, the plaintiff must raise a triable issue of fact as to whether:  (1) he was "subjected to verbal or physical conduct" because he engaged in protected activity; (2) "the conduct was unwelcome," and (3) "the conduct was sufficiently severe or pervasive to alter the  conditions of [his] employment and create an abusive work environment."  *Manatt v. Bank of America, NA*, 339 F3d 792, 798 (9th Cir 2003), quoting *Kang v. U. Lim. Am., Inc.*, 296 F3d 810, 817 (9th Cir 2002).  If a plaintiff satisfies these elements, then the employer is liable for failing to remedy or prevent a hostile work environment that management-level employees knew, or in the exercise of reasonable care, should have known existed.  *EEOC v. Hacienda Hotel*, 881 F2d 1504, 1515-16 (9th Cir 1989), *overruled on other grounds by Burrell v. Star Nursery, Inc.*, 170 F3d 951 (9th Cir 1999).  To determine whether a work environment is objectively hostile, the court must consider all of the circumstances surrounding the offensive conduct, including the frequency of the discriminatory conduct and its severity, whether the conduct is physically threatening or humiliating or a mere

offensive utterance, and whether the conduct unreasonably interferes with an employee's work performance. *Harris v. Forklift Systems, Inc.*, 510 US 17, 23 (1993).

To support his hostile work environment claim, Pies appears to rely upon his feeling that he was singled out and targeted by management in such a way as to cause him extreme emotional stress. However, even viewing the facts in the light most favorable to Pies and giving him the benefit of every doubt, the conduct he describes is neither severe nor pervasive enough to establish a hostile work environment claim.

Even if the alleged acts rose to the level of creating a hostile work environment, the BPA took prompt action once Pies complained to the EEO. When "an employer knows or should know of harassment, a remedial obligation kicks in." *Fuller v. City of Oakland*, 47 F3d 1522, 1528 (9th Cir 1995). "Such an employer will be liable for the hostile work environment created by the coworker unless 'the employer . . . take[s] adequate remedial measures in order to avoid liability.'" *Star v. West*, 237 F3d 1036, 1038 (9th Cir 2001), quoting *Yamaguchi v. U.S. Dep't of Air Force*, 109 F3d 1475, 1482 (9th Cir 1997).

Pies first spoke to his EEO counselor about reassignment at their first meeting on March 20, 2006. By the following week, beginning on March 27, 2006, Pies had begun an informal project detail assignment on the Transmission Line in Vancouver with King as his supervisor. Pies's reassignment became permanent on June 24, 2006. The record supports the conclusion that the BPA took prompt, adequate remedial action once it became aware of Pies's complaints. Thus, summary judgment should be granted on Pies's hostile work environment claim, insofar as he has brought such a claim.

///

21 - FINDINGS AND RECOMMENDATION

## RECOMMENDATION

For the reasons discussed above, defendant's Motion for Summary Judgment (docket # 18) should be GRANTED, and a judgment should be entered dismissing this case.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due October 12, 2010. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

## NOTICE

This Findings and Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until after entry of a judgment.

DATED this 23rd day of September, 2010.


s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge